[Cite as *In re Z.G.A.A.*, 2024-Ohio-326.]

COURT OF APPEALS
COSHOCTON COUNTY, OHIO
FIFTH APPELLATE DISTRICT

IN RE: Z.G.A.A & Z.A.

JUDGES:
Hon. W. Scott Gwin, P.J.
Hon. William B. Hoffman, J.
Hon. Craig R. Baldwin, J.

Case Nos. 2023CA0027 & 2023CA0028

O P I N I O N

CHARACTER OF PROCEEDINGS:     Appeal from the Coshocton County Court
                              of Common Pleas, Juvenile Division, Case
                              No. 20213002

JUDGMENT:                     Affirmed

DATE OF JUDGMENT ENTRY:       January 30, 2024

APPEARANCES:

For Mother                          For Father

RICHARD D. HIXSON                   JEFFREY A. MULLEN
3808 James Court, Suite #2          Coshocton County Public Defender
Zanesville, Ohio 43701              239 N. Fourth Street
                                    Coshocton, Ohio 43812
For Appellee

BENJAMIN HALL                       Guardian ad Litem
Coshocton County Prosecuting Attorney
                                    SHEILA MAYSE
KATELYNN R. DAVIS                   139 S. 3rd Street
Assistant Prosecuting Attorney      Coshocton, Ohio 43812
318 Chestnut Street
Coshocton, Ohio 43812

*Hoffman, J.*

{¶1}   In Coshocton App. No. 2023CA0027, appellant T.A. ("Mother") appeals the October 5, 2023 Judgment Entry entered by the Coshocton County Court of Common Pleas, Juvenile Division, which terminated his parental rights with respect to her minor child ("the Child"), and granted permanent custody of the Child to appellee Coshocton County Department of Job and Family Services ("CCDJFS").  In Coshocton App. No. 2023CA0028, appellant D.R. ("Father") appeals the same with respect to the termination of his parental rights as to the Child.

## STATEMENT OF THE CASE AND FACTS

{¶2}   Mother and Father are the biological parents of the Child.  Mother and Father began their relationship in 2011, but never married.  CCDJFS had involved with the family since 2018, due to concerns surrounding Parents' three other children ("the Siblings").  On September 10, 2020, prior to the Child's birth, CCDJFS moved for permanent custody of the Siblings.

{¶3}   On January 8, 2021, CCDJFS filed a complaint, alleging the Child was dependent and seeking temporary custody and protective supervision of the Child.  At the adjudicatory arraignment on February 3, 2021, the trial court entered pleas of denial on behalf of Parents.  The trial court denied CCDJFS's request for emergency temporary custody, but granted the Agency protective supervision while the Child remained in the legal custody of Parents.  The trial court appointed Sheila Mayse as Guardian ad Litem ("GAL") for the Child on March 8, 2021. Mayse was also serving as GAL for the Siblings. CCDJFS filed a case plan on March 16, 2021, which the trial court adopted.  At the adjudicatory hearing on April 1, 2021, Parents stipulated to a finding of dependency.  The trial court found the Child to be dependent and immediately proceeded to disposition.

The trial court ordered the Child remain in the legal custody of Parents under the continuing protective supervision of CCDJFS.

{¶4} On July 15, 16, and 22, 2021, the trial court conducted a hearing on CCDJF's motion for permanent custody in the Siblings' case. Via Judgment Entry filed February 8, 2022, the trial court terminated Parents' parental rights with respect to the Siblings and awarded permanent custody of the Siblings to CCDJFS. Parents filed their respective appeals to this Court, which affirmed the trial court's decision. See, *In re F.A.*, 5th Dist. Coshocton No. No. 2022CA0007, 2022-Ohio-3723; *In re J.R.*, 5th Dist. Coshocton No. 2022CA0008, 2022-Ohio-3724; *In re R.R.*, 5th Dist. Coshocton No. 2022CA0009, 2022-Ohio-3725.

{¶5} On December 13, 2021, CCDJFS filed a motion requesting a six-month extension of temporary custody in the instant action. The trial court conducted an annual review hearing on January 5, 2022, and maintained the status quo. The trial court also granted CCDJFS a six-month extension of temporary custody. On May 6, 2022, CCDJFS filed a second request for a six-month extension of temporary custody, which the trial court granted on September 6, 2022.

{¶6} On August 31, 2022, CCDJFS filed a motion to change custody, seeking temporary custody of the Child. The trial court granted an ex parte order on September 1, 2022, granting emergency temporary custody of the Child to CCDJFS. The following day, the trial court conducted an emergency shelter care hearing and continued the Child in the emergency temporary custody of CCDJFS.

{¶7} On September 12, 2022, Mother filed a motion to set aside the magistrate's September 1, 2022 ex parte order, objections to the magistrate's September 6, 2022

decision, and a motion to set aside said decision. The same day, Father filed a motion to set aside the magistrate's decision, joining Mother's motion. Father filed objections to the magistrate's decision on September 19, 2022. Via Judgment Entry filed October 6, 2022, the trial court denied Mother and Father's motions to set aside the magistrate's ex parte order, but granted Parents' objections to the magistrate's decision. The trial court scheduled a hearing for November 3, 2022, on Mother and Father's objections to the magistrate's decision and CCDJFS's August 31, 2022 motion for change of custody. Via Judgment Entry filed November 21, 2022, the trial court ordered the Child remain in the temporary custody of CCDJFS.

**{¶8}** On May 23, 2023, CCDJFS filed a motion for permanent custody. Mother filed a motion for custody on June 14, 2023. The GAL filed a report on August 10, 2023, recommending permanent custody of the Child be granted to CCDJFS. The trial court conducted a hearing on both motions on August 17, 2023.

**{¶9}** Andrea Schmitt, a licensed social worker with Muskingum Valley Health Centers, testified she began counseling Father in mid-October, 2022. Schmitt diagnosed Father with major depression with anxious distress. Schmitt explained much of Father's depression is a reaction to the circumstances which had arisen in his life. Schmitt did not receive any of Father's prior counseling records.

**{¶10}** Jessica Jewell, a licensed social worker with Muskingum Valley Health Centers, testified she began counseling Mother in November, 2022. Jewell noted Mother had been fairly consistent in attending her therapy sessions. Mother's primary diagnosis was bipolar disorder, which she and Jewell were addressing through cognitive behavioral therapies. Jewell explained many individuals who have bipolar disorder are able to

function and manage well in their day-to-day lives, including childcare and employment responsibilities.  Jewell's last appointments with Mother prior to the permanent custody hearing were on May 20, 2023, July 26, 2023, and August 15, 2023.  Jewell acknowledged she had not reviewed any of Mother's previous counseling records.

{¶11}  Ali Bates, a licensed social worker at Family and Children First Council, supervised visitation between Parents and the Siblings.  Parents would bring the Child to those visits.  Bates officially "took over visitation" when the Child was removed in September, 2022.  Transcript of Proceedings at p. 56.  Bates stated Family and Children First Council provided parent coaching to Parents, which included discussions about routine and structure, appropriate disciplining, and age appropriate activities.  Parent coaching stopped in December, 2022, because "there was just no progress."  *Id.* at p. 57.  Bates added, "The parents did not engage in the – in the parent coaching sessions.  Their engagement was very limited or very argumentative or dismissive or didn't agree with our parent coaching."  *Id.*

{¶12}  Bates indicated she observed several safety concerns during Parents' visits with the Child.  Specifically, Parents were unaware of what was age-appropriate for the Child and did not have age-appropriate expectations of the Child.  Bates noted she had very limited engagement with Father, in general, and although Mother engaged in conversation, she was argumentative.  Mother did not accept the mentoring and modeling Bates offered.  Parents did not bring age-appropriate activities for the Child.  Father brought his own art supplies to one visit, but would not allow the Child to play with any of it.  Several times, Mother became aggressive and grabbed the Child when the Child threw a temper tantrum or spilled milk.  During visits, Father would lay on the floor and fall

asleep. Mother expressed frustration with Father's lack of engagement and took her frustration out on the Child.

**{¶13}** Erin Heard, formerly an intake and ongoing case worker supervisor with CCDJFS, was involved with Parents and the Child from March, 2022, through May, 2023. Heard wrote the initial case plan in the Siblings' case. She explained the concerns, at that time, were housing, parenting, mental health, and parentified children. Heard noted, throughout the Siblings' case, there was a lack of housing stability and lack of supervision. In addition, Mother was observed as being very harsh with the oldest Sibling. The condition of the home raised concerns for the safety of the Siblings due to the hazards found. Heard stated Parents did not accept responsibility and blamed the Siblings for their problems.

**{¶14}** During the Siblings' case, CCDJFS identified ongoing mental health concerns with Parents, which required consistent, long-term therapy. Mother and Father completed psychological evaluations at Chrysalis Counseling Center. Mother had also completed a psychological evaluation in Muskingum County. Those reports were admitted into evidence in the instant action. As the result of the evaluations, Mother and Father were referred to ongoing counseling services. Heard testified the concerns identified in the Siblings' case still existed as such related to the Child. Heard explained:

> The family has, in five years, not shown stability with the care-taking of housing, their children. They have not been parenting full time for many years. A lot of difficulties with parenting have happened, not necessarily when the child was an infant but as the child gets older, so we have children

that are aging.  We also still have a child that's not able to provide any self-protection and won't for some time, based on age and developmental levels.  So that is all my concerns as of today.

**{¶15}**  Tr. at p. 108.

**{¶16}**  Heard added the Child is placed with the Siblings and will be able to grow up with the Siblings and have a relationship with them.

**{¶17}**  Lexi Montgomery, the ongoing CCDJFS worker, testified she was assigned to the case in May, 2022.  The concerns existing when the case was transferred to Montgomery still existed at the time of the hearing.  Specifically, CCDJFS had concerns regarding Mother and Father's mental health, the lack of stable, independent housing, the living conditions in the home, Mother and Father's parenting skills, and the Child's medical condition.[1]

**{¶18}**  Montgomery made a number of unannounced home visits when the Child was still in Parents' custody.  Montgomery found clutter throughout the house with paths between each of the rooms due to boxes, totes, and miscellaneous "junk items" laying around the house.  Tr. at p. 126.  Montgomery discussed with Parents a number of times the dangers of having the piles around the house.  Montgomery also observed dog feces on the floor and noticed the odor of dog urine.  When Montgomery mentioned the dog feces, Parents would not rush to clean up the messes.  Often the grandmother, who was living in the home, would be the one cleaning up after the dogs.  When Montgomery

---

[1] The Child was diagnosed with STAT 3 Gain of Function disease, an autoimmune disorder which causes difficulty healing from infections and requires a clean, sanitary environment.

discussed the need to clean the home, Parents responded it was not their home and not their job to clean.

**{¶19}** Parents placed the Child in a pack and play to sleep. The Child was covered with blankets, pillows, and stuffed animals. Montgomery warned Parents of the dangers the items posed to the Child, but Parents never removed the items. During one visit, Montgomery watched as the Child removed Mother's vape pen from her purse. Mother did not acknowledge the Child had the vape pen. Mother acknowledged the Child had found the vape pen on other occasions, but noted the Child, who was one and a half years old, knew better.

**{¶20}** After the Child was removed, Montgomery continued to conduct home visits. However, Parents eventually stopped allowing Montgomery into the home. Parents informed her the living environment remained unchanged. As a result, Montgomery conducted the home visits on the front porch. Parents lived in a residence owned by Mother's sister. They repeatedly reported they were going to be evicted, but had been given a number of extensions. Father had stable employment, however, Montgomery was not able to confirm Mother's employment. Mother informed Montgomery she could not depend on Father's income, explaining Father would "blow it" on fireworks rather than paying bills.

**{¶21}** Regarding Mother's mental health, Montgomery stated Mother was in counseling from late January, 2022, until May, 2022, but had a lapse in counseling from May, 2022, until November, 2022. Mother failed to attend her medication appointments and had been without her prescriptions since May, 2022. Father was not compliant with taking his mental health medication. He attended his first counseling appointment in

October, 2022, but did not attend a second appointment until December, 2022. Father had a lapse in counseling from December, 2022, until April, 2023.

{¶22} Montgomery observed the Child with the foster parents and the Siblings. The Child is bonded with the foster parents as well as the Siblings. The Child is happy, outgoing, and affectionate. The Child is healthy and has gained weight. Montgomery noted, there has been "[j]ust a complete turnaround [with the Child] from the day of removal until now that I have seen and others in my office." Tr. at p. 144. Although Parents provided names for kinship placement, they did not provide contact information. No one has reached out to CCDJFS.

{¶23} Sheila Mayse, the GAL, indicated the testimony she heard at the hearing did not impact her recommendation permanent custody be granted to CCDJFS. Based upon her own observations as well as the information obtained during the pendency of the case, Mayse found Parents had not improved their skills or utilized their resources as to provide for the best interest of the Child. Mayse noted Parents' mental health diagnoses, their lack of consistent treatment, and their inability to apply treatment recommendations were her greatest concern. Mayse testified the Child is bonded with her foster family and her two Siblings, who are living in the same home.

{¶24} Via Judgment Entry filed October 6, 2023, the trial court terminated Parents' parental rights and granted permanent custody of the Child to CCDJFS. The trial court found Parents continuously and repeatedly failed to substantially remedy the conditions causing the Child to be placed outside the home; had demonstrated a lack of commitment toward the Child by showing an unwillingness to provide an adequate home for the Child; and had had their parental rights with respect to the Siblings terminated. The trial court

also found, despite CCDJFS's reasonable efforts, the removal of the Child was necessary. The trial court further found granting permanent custody to CCDJFS was in the Child's best interest.

**{¶25}** It is from this judgment entry Parents appeal.

**{¶26}** In Case No. 2023CA0027, Mother raises the following assignments of error:

I. THE TRIAL COURT ERRED BY GRANTING JFS'S MOTION FOR PERMANENT CUSTODY WITHOUT FINDING THAT Z.A. COULD NOT BE PLACED WITH EITHER PARENT WITHIN A REASONABLE TIME OR SHOULD NOT BE SO PLACED.

II. THE TRIAL COURT ERRED IN FINDING THAT MULTIPLE R.C. 2151.414(E) FACTORS APPLIED THAT WOULD NECESSITATE FINDING THAT Z.A. COULD NOT BE PLACED WITH EITHER PARENT WITHIN A REASONABLE TIME OR SHOULD NOT BE SO PLACED.

III. THE TRIAL COURT ERRED IN FINDING THAT PERMANENT CUSTODY WAS IN THE BEST INTERESTS OF THE CHILDREN [SIC]. [SIC], AS SUCH A FINDING WAS UNSUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

IV. THE TRIAL COURT'S FINDING THAT REASONABLE EFFORTS HAVE BEEN MADE BY JFS UNDER R.C. 2151.419 IS UNSUPPORTED BY THE RECORD.

V. THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED APPELLANT'S RIGHT TO DUE PROCESS OF LAW AND EVID. R. 802 BY ADMITTING A PAST PSYCHOLOGICAL REPORT AND RELYING UPON THE SAME WITHOUT THE OPPORTUNITY FOR APPELLANT TO CROSS-EXAMINE THE PREPARER.

VI. THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED APPELLANT'S RIGHT TO DUE PROCESS OF LAW WHEN IT ADMITTED AND CONSIDERED MOTHER'S TWELVE-YEAR-OLD PSYCHOLOGICAL REPORT, AS IT WAS IRRELEVANT UNDER EVID. R. 402 AND, EVEN IF RELEVANT, ITS EXCLUSION FROM EVIDENCE WAS MANDATORY UNDER EVID. R. 403(A).

**{¶27}** In Case No. 2023CA0028, Father raises the following assignments of error:

I. THE TRIAL COURT'S JUDGMENT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

II. THE TRIAL COURT'S JUDGMENT VIOLATES DUE PROCESS.

**{¶28}** These cases come to us on the expedited calendar and shall be considered in compliance with App. R. 11.2(C).

MOTHER

I, II

{¶29} In her first assignment of error, Mother argues the trial court erred in granting CCDJFS's motion for permanent custody without finding the Child could not be placed with Mother or Father within a reasonable period of time or should not be placed with Parents.  In her second assignment of error, Mother submits the trial court erred in finding multiple R.C. 2151.414(E) factors applied which would necessitate a finding the Child could not or should not be placed with Parents within a reasonable time.

{¶30} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

{¶31} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or

more months of a consecutive twenty-two month period ending on or after March 18, 1999.

{¶32} R.C. 2151.414(E) provides:

In determining at a hearing held pursuant to division (A) of this section * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section * * * one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when

able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, * * *.

R.C. 2151.414(E).

**{¶33}** Mother contends the trial court erred because the judgment entry does not make a specific finding, as required by the mandatory language of the statute, the Child could not be placed with either Mother or Father within a reasonable time or should not be placed with Parents. Mother concludes the judgment should be reversed on this basis. We disagree. Mother further maintains the R.C. 2151.414(E) factors found by the trial court, to wit: R.C. 2151.414(E)(1), (4), and (11), as set forth, supra, were not supported by clear and convincing evidence. We also disagree.

**{¶34}** The trial court is required by the statute to find, by clear and convincing evidence, certain criteria have been met, and the trial court must state those findings on the record, such that it is clear to all parties the decision is supported by the facts. We find the trial court did so in the instant action. The trial court's explicit findings under R.C. 2151(E)(1), (4), and (11) create an implicit conclusion the trial court found R.C. 2151.414(B)(1)(a) was applicable.

**{¶35}** We further find the trial court's failure to reproduce the exact statutory language was not prejudicial to Mother. See, *In the Matter of Kyle Hart* (Mar. 9, 1993),

Marion App. No. 9-92-47, unreported.   The trial court's findings "[Parents] failed continuously and repeatedly to substantially remedy the conditions causing the Child to be placed outside the Child's home;" "[Parents] have demonstrated a lack of commitment toward the Child by showing an unwillingness to provide an adequate permanent home for the Child;" and "[Parents] have had parental rights involuntarily terminated with respect to a sibling of the [Child]" are supported by clear and convincing evidence.

{¶36} The testimony at the permanent custody hearing established the same problems which resulted in the termination of Mother's parental rights with respect to the Siblings had not been resolved.   Mother was not consistent with her mental health counseling.  At times during the pendency of the case, Mother and Father each stopped taking the medications prescribed to address their mental health problems.  Parents failed to maintain a clean home despite the Child's medical condition which required a sanitary living environment.  CCDJFS workers observed dog feces and urine on the floor, which Parents did not clean even after such was brought to their attention.  The house was cluttered with boxes and totes, requiring paths to be created to move from room to room.  Parents failed to remedy the situation despite numerous discussions to do so.  During the most recent visits, Parents refused to allow CCDJFS's workers into the home.

{¶37} Based upon the foregoing, Mother's first and second assignments of error are overruled.

MOTHER

III

FATHER

I

**{¶38}** In her third assignment of error, Mother challenges the trial court's finding it was in the Child's best interest to grant permanent custody to CCDJFS as against the manifest weight of the evidence, and not supported by clear and convincing evidence. In his first assignment of error, Father contends the trial court decision to grant permanent custody of the Child to CCDJFS was against the manifest weight of the evidence.

**{¶39}** As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent, and credible evidence upon which the fact finder could base its judgment. *Cross Truck v. Jeffries*, 5th Dist. Stark No. CA5758 (Feb. 10, 1982). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

**{¶40}** In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D)(1) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (b) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (c) the custodial history of the child; (d) the child's need for a

legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and (e) whether any of the factors in division (E)(7) to (11) of R.C. 2151.414 apply in relation to the parents and child.

**{¶41}** Parents each assert they have complied with their case plans and the trial court's failure to grant a six-month extension was not in the Child's best interest. Mother claims the trial court failed to consider the limited visitation she was granted with the Child, which made it difficult for her and the Child to form a bond. Father claims he "substantially complied with the case plan goals." Brief of Appellant D.R. at p. 7. Father adds, "[h]e consistently maintained stable housing, was employed, attended counseling for his depression, and participated according to program rules in supervised time to monitor parenting progress." *Id.* We find the record belies Parents' assertions.

**{¶42}** Parents had limited visitation with the Child due to their failures, not the failures of CCDJFS. Parents had simply not made significant progress on their case plans. There was nothing to support their contention a six-month extension would change the situation.

**{¶43}** Parents were not receptive to parent coaching, becoming argumentative or dismissive of suggestions. Parents were unaware of what was age-appropriate for the Child and did not have age-appropriate expectations of the Child. During one visit, Father brought his own art supplies, but would not permit the Child to use the items. Mother became aggressive and grabbed the Child when the Child threw a temper tantrum or spilled milk. During visits, Father would lay on the floor and fall asleep. Mother expressed frustration with Father's lack of engagement and took her frustration out on the Child. Mother and Father were required to provide a safe and clean home environment. A

sanitary home environment was especially important for the specialized health needs of the Child. CCDJFS found the home cluttered and smelling of animal feces and urine. Parents eventually refused to allow CCDJFS into the home. Additionally, Parents were not appropriately addressing their mental health issues. Mother was inconsistent with counseling. Parents stopped taking their prescribed medications.

**{¶44}** Parents had not improved their skills or utilized their resources as to provide for the best interest of the Child Parents' mental health diagnoses, their lack of consistent treatment, and their inability to apply treatment recommendations remained concerning to all involved with the family.

**{¶45}** The Child is bonded with her foster family and her two Siblings, who are living in the same home. The foster parents are able to address her medical needs. The Child is happy, outgoing, and affectionate. The Child is healthy and has gained weight.

**{¶46}** Based upon the foregoing, we find the trial court's decision to grant permanent custody to CCDJFS was not against the manifest weight of the evidence. Mother's third assignment of error is overruled. Father's first assignment of error is overruled.

MOTHER

IV

**{¶47}** In her fourth assignment of error, Mother maintains the trial court erred in granting CCDJFS's motion for permanent custody because CCDJFS failed to make reasonable efforts. Specifically, Mother submits, "[a]fter the permanent custody motion was filed on May 17th,2023, the agency failed to make progress with Mother's visitation despite progress on her case plan objectives." Brief of Appellant T.A. at p. 21. Mother

further states, "the agency suddenly removed the children [sic] on September 1, 2022 from the custody of Mother." *Id.* at p. 22. Mother adds, "[t]he child was removed due to JFS's belief that the child suffered medical neglect. However, upon treating the child, she was not returned and kept in foster care." *Id.* Mother concludes CCDJFS's filing for permanent custody despite the availability of a second six-month extension was "contrary to the court's finding that reasonable efforts were made." *Id.* We disagree.

**{¶48}** The Ohio Revised Code imposes a duty on the part of children services agencies to make reasonable efforts to reunite parents with their children where the agency has removed the children from the home. R.C. 2151.419. "Case plans are the tools that child protective service agencies use to facilitate the reunification of families who * * * have been temporarily separated." *In re Evans*, 3d Dist. Allen No. 1-01-75, 2001 WL 1333979, *3, 2001 Ohio App. LEXIS 4809 (Oct. 30, 2001). To that end, case plans establish individualized concerns and goals, along with the steps the parties and the agency can take to achieve reunification. *Id.*

**{¶49}** R.C. Chapter 2151 does not define "reasonable efforts," but the term has been construed to mean "[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, 862 N.E.2d 816. "Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification." *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15 and Wyandot Nos. 16-12-16, 2013-Ohio-4317, ¶ 95 (Citation and internal quotations omitted).

**{¶50}** What constitutes "reasonable efforts" requires consideration of the nature of a case plan and varies with the circumstances. *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 31. "In determining whether the agency made reasonable efforts [pursuant to R.C. 2151.419(A)(1)] to prevent the removal of the child from the home, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." *In re Lewis*, 4th Dist. No. 03CA12, 2003-Ohio-5262, ¶ 16. " 'Reasonable efforts' does not mean all available efforts." *Id.* A "reasonable effort" is "* * * an honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage." *In re Weaver*, 79 Ohio App.3d 59, 63, 606 N.E.2d 1011 (12th Dist. 1992).

**{¶51}** As stated, supra, the issue is not whether there was anything more the agency could have done, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case. We find CCDJFS's case planning and efforts were reasonable and diligent under the circumstances of this case. CCDJFS had been involved with the family since 2018.  After the removal of the Siblings, including moving for permanent custody, CCDJFS did not immediately seek removal or custody of the Child.  Rather, Mother was given almost two years to work on a case plan solely addressing the needs of the Child.  Despite this, Mother did not successfully complete case plan services.

**{¶52}** Upon review of the entire record, we find the trial court did not err in concluding CCDJFS made reasonable efforts to reunite Mother with the Child.

**{¶53}** Mother's fourth assignment of error is overruled.

FATHER

II

**{¶54}** In his second assignment of error, Father asserts the trial court's decision granting permanent custody of the Child to CCDJFS violated his right to due process.

**{¶55}** We recognize "parents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court].' " *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). The Ohio Supreme Court has also "long held that parents who are 'suitable' have a 'paramount' right to the custody of their children." *Id.*, quoting *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977). (Other citations omitted.) Indeed, the right to raise one's "child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990). However, "the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed. Ultimately, parental interests are subordinate to the child's interest when determining the appropriate resolution of a petition to terminate parental rights." *In re B.C.*, supra at ¶ 17. (Citations and quotations omitted.)

**{¶56}** Indeed, "[p]ermanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case. Therefore, parents must be afforded every procedural and substantive protection the law allows." *Id.* at ¶ 19, (Citations and internal quotations omitted). "In the context of termination of parental rights, due process requires that the state's procedural safeguards ensure that the termination proceeding is fundamentally fair." *Id.* at ¶ 17.

{¶57} Specifically, Father argues, although CCDJFS complied with the procedural requirements of the statutes, the substance was lacking. Father adds CCDJFS's failure to complete reasonable efforts to prevent the continued removal of the Child while reunification was achievable deprived him of his fundamental right to parent his own child and violated substantive due process as the case for permanent custody was premature.

{¶58} As discussed in our analysis of Mother and Father's other assignments of error, supra, CCDJFS began its involvement with the family in 2018. While the permanent custody proceeding with respect to the Siblings was pending, the Child was born. The Child remained with Parents for almost two years before the trial court issued an ex parte order of emergency temporary custody. During that time period, and during the three years the Siblings' case was pending, CCDJFS made every effort to reunify the family. Parents remained resistant to any meaningful change. The same issues which resulted in the removal of the Siblings persisted.

{¶59} We find the trial court did not violate Father's right to due process by granting permanent custody of the Child to CCDJFS.

{¶60} Father's second assignment of error is overruled.

MOTHER

V, VI

{¶61} In her fifth assignment of error, Mother contends the trial court abused its discretion and violated her right to due process by admitting a past psychological report, and relying upon the same, without providing Mother with an opportunity to cross-examine the preparer. In her sixth assignment of error, Mother maintains the trial court abused its discretion and violated her right to due process of the law by admitting said report as such

was irrelevant under Evid. R. 402, and even if the report was relevant, its exclusion was mandatory under Evid. R. 403(A).

**{¶62}** At the permanent custody hearing, Erin Heard, formerly an intake and ongoing case worker supervisor with CCDJFS, testified regarding the November 25, 2011 report prepared by Dr. Gary Wolfgang, following his September 23, 2011 psychological evaluation of Mother. Dr. Wolfgang's psychological report was offered as JFS Exhibit C. Mother and Father both objected to the admission of Dr. Wolfgang's report on the basis of relevancy.

**{¶63}** Attorney Ashley Johns, counsel for CCDJFS, responded to Parents' objections as follows:

> As it relates to the relevance, I think it was actually counsel's questions is [sic] what makes it relevant. The question was why the agency did not seek a subsequent, third psychological evaluation. The answer to that is the psychological evaluations in our possession are consistent. The fact that [Mother's] current counselor is not counseling her based on those psychological reports is concerning to the agency, that that counselor is basing her entire regimen on self-report of [Mother] * * * and the counselor admits to having not reviewed prior records. So, the consistency of these mental health concerns from that report to the next report are what the agency is admitting this for * * * its relevance is simply that it reiterates what's in the 2019 report.
>
> Tr. at pp. 171-172.

**{¶64}** The trial court admitted Dr. Wolfgang's report, assuring counsel for the parties it would give the exhibit the proper weight, given the age of the report. The trial court stated its understanding the report was not being used for its psychological or medical value, but "rather for historical look-back as to what issues have been and may or may not continue to be." *Id.* at p. 172.

*Due Process*

**{¶65}** The general law regarding due process and permanent custody proceedings is set forth in Father's second assignment of error, supra.

**{¶66}** In support of her position the admission of Dr. Wolfgang's report violated her due process rights, Mother relies upon the Ohio Supreme Court's decision in *In re Hoffman*, 97 Ohio St.3d 92, 776 N.E.2d 485, 2002-Ohio-5368, in which the Court held:

> Due process necessitates that appellee should have had the right to cross-examine the guardian ad litem, since the trial court relied upon the report. As such, notwithstanding R.C. 2151.414(C), we hold that in a permanent custody proceeding in which the guardian ad litem's report will be a factor in the trial court's decision, parties to the proceeding have the right to cross-examine the guardian ad litem concerning the contents of the report and the basis for a custody recommendation. Without these safeguards, there are no measures to ensure the accuracy of the information provided and the credibility of those who made statements.
>
> *Id.* at ¶ 25.

**{¶67}** This Court extended the *Hoffman* rationale to psychological evaluations. *In re R.G.M.*, 5th Dist. Muskingum Nos. CT2022-0046 and 0047, 2023-Ohio-685, 210 N.E.3d 15, ¶ 22.

**{¶68}** We find the trial court did not violate Mother's due process rights by admitting Dr. Wolfgang's psychological report without providing Mother with an opportunity to cross-examine Dr. Wolfgang. The report was admitted to show Mother's mental health issues remained consistent between 2011, and 2019. Cross-examination of Dr. Wolfgang would not call into doubt Mother's on-going mental health issues.

**{¶69}** Assuming arguendo, the trial court erred in admitting Dr. Wolfgang's report, we find Mother's rights were not substantially affected. An "[e]rror in the admission of evidence is not ground for reversal unless substantial rights of the complaining party were affected or it appears that substantial justice was not done." *Petti v. Perna* (1993), 86 Ohio App.3d 508, 514, 621 N.E.2d 580. Further, "[i]n determining whether a substantial right of a party has been affected, the reviewing court must decide whether the trier of fact would have reached the same decision had the error not occurred." *Id.*, citing *Hallworth v. Republic Steel Corp.* (1950), 153 Ohio St. 349, 41 O.O. 341, 91 N.E.2d 690. We find, with the testimony offered at the permanent custody hearing as well as the other exhibits admitted, the trial court would have reached the same decision.

*The Rules of Evidence*

**{¶70}** Pursuant to Juv.R. 34(I), "[t]he Rules of Evidence shall apply in hearings on motions for permanent custody." Juv. R. 34(I). See, also *In re Washington*, 143 Ohio App.3d 576, 581, 758 N.E.2d 724 (2001). As a general rule, all relevant evidence is admissible. Evid.R. 402. cf. Evid.R. 802. "Although relevant, evidence is not admissible if

its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid. R. 403(A). "[H]earsay is inadmissible in . . . a [permanent custody] proceeding unless it falls within a recognized exception to the hearsay rule." *In re A.E.*, 10th Dist. Franklin Nos. 19AP-782, 19AP-783, and 19AP-784, 2021-Ohio-488, ¶ 46.

{¶71} The admission or exclusion of relevant evidence rests in the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). Our task is to look at the totality of the circumstances in the case *sub judice*, and determine whether the trial court acted unreasonably, arbitrarily or unconscionably in allowing or excluding the disputed evidence. *State v. Oman*, 5th Dist. Stark No. 1999CA00027, 2000 WL 222190. We also note, in a bench trial, a trial judge is "presumed to have considered only the competent and material evidence." *State v. Davis*, 10th Dist. Franklin No. 17AP-438, 2018-Ohio-58, 2018 WL 333000, ¶ 32, citing *State v. Sanders*, 92 Ohio St.3d 245, 267, 750 N.E.2d 90 (2001).

{¶72} For the reasons we found the trial court did not violate Mother's due process rights, supra, we find the trial court did not abuse its discretion in admitting Dr. Wolfgang's report. Further, Mother has failed to show how she was prejudiced by the trial court's admission of said report. "Most importantly, inadmissible hearsay is grounds for reversal only if the juvenile court relied on the evidence to terminate parental rights." *In re J.J.,* 12th Dist. No. CA2005–12–525, 2006–Ohio–2999, ¶ 19; *In re M.H.,* 8th Dist. No. 80620, 2002–Ohio–2968, ¶ 79. The record does not support a finding the trial court was strongly influenced by Dr. Wolfgang's report in reaching its decision to grant permanent custody of the Child to CCDJFS.

**{¶73}** Based upon the foregoing, Mother's fifth and sixth assignments of error are overruled.

**{¶74}** The judgment of the Coshocton County Court of Common Pleas, Juvenile Division, is affirmed.


By: Hoffman, J.

Gwin, P.J.  and

Baldwin, J. concur