**[Cite as *In re J.H.*, 2025-Ohio-5218.]**

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| IN THE MATTER OF:<br><br>J.H.<br><br>J.D.<br><br>K.T. | Case Nos. 2025CA00050, 2025CA00051, & 2025CA00052<br><br>Opinion And Judgment Entry<br><br>Appeal from the Stark County Court of Common Pleas, Juvenile Division, Case Nos. 2023JCV00191, 2023JCV00192, & 2023JCV00193<br><br>Judgment:   Affirmed<br><br>Date of Judgment Entry: November 19, 2025 |

**BEFORE:**  WILLIAM B. HOFFMAN, P.J., ANDREW J. KING, J., &  KEVIN W. POPHAM, J.;  Appellate Judges

**APPEARANCES:** Brandon J. Waltenbaugh for Appellee; Richard D. Hixson for Appellant

OPINION

*Popham, J.*

{¶1}    Mother appeals the judgment of the Stark County Court of Common Pleas, Juvenile Division, terminating her parental rights and granting permanent custody of J.H., J.D., and K.T. ("Child 1," "Child 2," and "Child 3," individually; "the Children," collectively) to appellee Stark County Job and Family Services ("SCJFS").

*Facts & Procedural History*

{¶2}    T.T. is the mother ("Mother") of Child 1, born on February 13, 2014, Child 2, born on January 12, 2016, and Child 3, born on September 25, 2019.  J.D. is their father,

but did not have contact with SCJFS or the Children throughout the case. SCJFS became involved with the family in January of 2023 after allegations that Mother's paramour, D.A., repeatedly struck the Children – particularly Child 2, with a belt. Child 2 had visible injuries consistent with those claims. Child 2 also reported that D.A. knocked Mother down, pushed a television onto her, and stomped on it. Child 2 further stated that Mother put "white powder" in her mouth and lost consciousness. The Children stated Mother often left them unsupervised. Mother and D.A. denied all allegations.

{¶3} SCJFS implemented an out-of-home safety plan. The Children were first placed with D.A.'s mother but were later returned to Mother and D.A. after they agreed to participate in counseling and parenting education classes. They began the Goodwill Home-Based Parenting Program ("Goodwill Home"). However, Mother and D.A. were both uncooperative with the program, hostile to the Goodwill employees, misrepresented their works schedules, refused services, and failed to take responsibility for their actions. At some point during the program, D.A. admitted "whooping" Child 2 with a belt.

{¶4} On February 24, 2023, a SCJFS investigative worker met with Mother and D.A. to request that they comply with the safety plan, specifically, participating in Goodwill Home. D.A. refused to participate, and Mother stated she would not leave D.A. or seek other housing for herself or the Children. Accordingly, on February 24, 2023, SCJFS filed a neglect and/or dependency complaint for each of the Children.

{¶5} Following a February 27, 2023, shelter care hearing, on March 3, 2023, Attorney Cole Bond was appointed guardian ad litem ("GAL"). On March 22, 2023, the magistrate held a dispositional hearing.

{¶6} On May 24, 2023, the magistrate held an adjudicatory hearing – at which appellee moved to delete allegations of neglect. The magistrate granted the motion. Mother stipulated to a finding of dependency. The matter proceeded to disposition, and the Children were placed in the temporary custody of SCJFS.

{¶7} Also at the May 2023 hearing, the magistrate found the case plan for both Mother and D.A. to be appropriate. In the case plan, Mother was ordered to: complete a parenting assessment and follow all recommendations; remain substance-free; complete a drug and alcohol assessment and follow any recommendations; submit to random drug screens; secure and maintain appropriate housing; and obtain employment to have adequate income to provide for the basic needs of her children. D.A. was ordered to: obtain a domestic violence risk assessment and follow all recommendations from the service providers; remain substance-free; complete a drug and alcohol assessment and follow any recommendations; and submit to random drug screens.

{¶8} The magistrate held dispositional review hearings on August 24, 2023, January 23, 2024, July 23, 2024, and January 23, 2025.

{¶9} On December 21, 2023, SCJFS filed a motion to extend temporary agency custody to August 24, 2024. The trial court granted the motion. On July 5, 2024, SCJFS filed a second motion to extend temporary custody, which the trial court granted, extending temporary agency custody until February 24, 2025.

{¶10} On October 4, 2024, Mother moved for the return of the Children and termination of SCJFS involvement. On October 31, 2024, the trial court held a hearing during which Mother testified she had ended her relationship with D.A. The Children were returned to Mother under protective supervision, and the case remained open.

{¶11} On December 6, 2024, SCJFS again sought temporary custody of the Children, alleging that D.A. had resumed staying in the home and that Mother failed to cooperate with services (Goodwill Home, and a case management program) and counseling for the Children. After a December 9, 2024, shelter-care hearing, the Children were again placed in temporary custody of SCJFS. Mother's motion to set aside that order was denied on March 6, 2025.

{¶12} On January 15, 2025, SCJFS filed a motion for permanent custody of the Children. The GAL advised the trial court that Child 1 and Child 2 opposed the motion for permanent custody and disagreed with the recommendation of the GAL. The trial court appointed separate counsel for the Children.

{¶13} On April 18, 2025, the trial court conducted a hearing on SCJFS' motion for permanent custody, at which time the following testimony was adduced.

{¶14} Arwen John ("John") is the caseworker assigned to the Children. John testified to the case plan and Mother and D.A.'s progress on the case plan. Mother's case plan objectives included competing a parenting assessment and following all recommendations issued as a result of the assessment, obtaining independent housing, obtaining employment, and completing the Goodwill Parenting program. Mother completed the parenting evaluation, obtained housing and employment, and received a certificate of participation from the Goodwill Parenting program. Despite this, John did not feel Mother could safely parent due to Mother's continued involvement with D.A. and his history of violence toward her and the Children.

{¶15} D.A. refused to engage in or complete any of the items on his case plan. In early 2024, Mother told John that she ended her relationship with D.A. At that time, John

believed Mother accepted that D.A. could not be around the Children. Because Mother was doing well on her case plan objectives, the Children were returned to her in October of 2024, with protective supervision maintained by SCJFS. John made regular home visits with the family.

{¶16} John became concerned about the Children during her home visits. Mother denied that any abuse by D.A. had occurred and accused SCJFS of fabricating the abuse allegations. John felt this put Mother "right back to square one of nothing happened, he [D.A.] never hurt [the Children], and its all lies." Further, even when John did not ask the Children about D.A., the Children proactively and repeatedly told John that nobody lived in their house except for the Children and Mother. Mother also resisted unannounced home visits. Additionally, Mother cancelled numerous appointments with the Goodwill Home program and was going to be terminated from the program for her non-compliance.

{¶17} John received a call with information that a mandated reporter saw D.A. at Mother's home when the Children were there. After this report, John spoke to both Child 1 and Child 2 at school. Both Child 1 and Child 2 disclosed that Mother was currently in a romantic relationship with D.A.. Further, both Child 1 and Child 2 stated there was a recent physical altercation between Mother and D.A. Counsel for Mother objected to John's testimony regarding the tip from the mandatory reporter and John's testimony about what the Children told her. The trial court overruled Mother's objections.

{¶18} John described how Mother's attitude fluctuated throughout the case. First, Mother denied there was ever any abuse by D.A. When Mother broke up with D.A., she accepted some responsibility and stated she wanted to protect the Children from their abuser. Near the end of the Goodwill Parenting program, Mother again denied there was

any abuse by D.A. John does not believe Mother has successfully completed her case plan and does not believe it would be safe to return the Children to her.  John also believes the agency made reasonable efforts to assist with case plan services that would have resulted in reunification if they had been successfully completed.

{¶19}  John confirmed that the Children were in the temporary custody of SCJFS in a period of time in excess of twelve of the past twenty-two months (from May 24, 2023, to October 31, 2024, and from December 9, 2024, until April 17, 2025).

{¶20}  Dr. Aimee Thomas ("Thomas"), a licensed psychologist and professional clinical counselor, conducted the parenting evaluation of Mother.  Thomas testified Mother identified herself as a "wonderful mother" and denied any concerns about her relationship with D.A.  However, Mother acknowledged that she permitted D.A. to spank the children, and these spankings left marks on the Children.  Thomas found Mother lacked insight into the danger posed by D.A.  Thomas diagnosed Mother with dependent personality disorder and recommended Mother participate in individual counseling focused on building positive relationships.  Thomas opined that Mother should not regain custody of the Children unless D.A. completed his case plan, or D.A. otherwise ceased to pose a threat to the Children.  Thomas was concerned that, if the Children went back to Mother, D.A. would be around them, because Thomas had very little confidence that Mother would terminate her relationship with D.A.

{¶21}  Jennifer Fire ("Fire") is the supervisor of the Goodwill Parenting program. Fire testified that while Mother attended the classroom portion of the program and received a certificate of participation/completion, Fire was concerned about Mother's perspective on her relationship with D.A.  Mother confirmed to Fire that D.A. threw a television on top

of her, yet she told Fire that the incident "really wasn't that bad" and D.A. "was a great partner."  Fire attempted to help Mother understand that she and the Children are not safe in these types of situations, but Fire felt she was not successful in getting Mother to understand.  When Mother completed the Goodwill Parenting program in September in 2024, she did not complete several of the program goals, i.e., making good decisions and keeping inappropriate people away from the Children.

{¶22}  At the conclusion of the Goodwill Parenting program, Fire made the following recommendations for Mother: Mother attend individual counseling weekly; Mother participate in family counseling with the Children; Mother take the Children to counseling; Mother maintain employment and housing; Mother complete the Goodwill Home program; and Mother complete the parenting case management program through Goodwill.

{¶23}  On October 7, 2024, Mother started the Goodwill Home program.  However, Fire testified Mother's participation in the Goodwill Home program was brief.  In eight weeks, Mother cancelled the home visits six times.  Regarding the parenting case management program, Mother cancelled four meetings and, thus, was terminated from that program.  Fire does not believe Mother received any benefit from either the case management program or the Goodwill Home program due to Mother's lack of participation and high cancellation rate.  Fire did not believe that Mother terminated her relationship with D.A. because Mother continued to defend D.A.  Fire opined the Children cannot be safely returned to Mother.

{¶24}  Carrie Schnirring ("Schnirring") completed a trauma evaluation of Child 2. Thus, the statements Child 2 made to her were for purposes of medical diagnoses and

treatment. Child 2 told Schnirring that she wanted Mother and D.A. to "learn their lesson so she could go home." Child 2 reported to Schnirring that D.A. repeatedly hit her and Child 1 so hard with a belt that they had bruises on their backs, legs, and arms. Child 2 told Schnirring that D.A. would throw Mother to the ground so hard that Mother would also have bruises. Child 2 described to Schnirring an incident during which Child 2 saw D.A. throw a television on top of Mother and stomp on it so hard that Mother passed out. As part of the evaluation process, Schnirring assessed Child 2's mastery of the difference between a truth and a lie. Schnirring believed Child 2 understood the difference between a truth and a lie.

{¶25} Mother testified that she complied with her case plan by completing an evaluation at Lighthouse, completing an evaluation at CommQuest, submitting negative drug tests, maintaining employment, maintaining housing, and participating in Goodwill Parenting. Mother stated she engaged in the Goodwill Home program.

{¶26} When asked about D.A., Mother testified he "would never abuse them [the Children] or hit them in the face or anything like a belt like how they were saying because that was never true." Mother confirmed that D.A. threw a television on top of her and stomped on the television.

{¶27} When Mother was asked when her relationship with D.A. ended, Mother stated in ended in November or December of 2024 (after the Children were returned to her home). However, Mother subsequently testified that she was not in a relationship with D.A. at that time. Mother stated that, after October 31, 2024, D.A. was not living in her home, did not come to her home, and never saw the Children. Mother testified to the report made to SCJFS from a mandatory reporter, and stated she knew who the

mandatory reporter was. Mother stated that when the mandatory reporter saw D.A.'s car in Mother's driveway, it was actually D.A.'s grandmother who was visiting Mother and the Children. Mother testified she never engaged in joint counseling with the children because "they were supposed to contact [her], but [she] never got contacted." Mother stated that, other than the counseling, SCJFS has never asked her to engage in any additional services.

{¶28} On cross-examination, Mother testified that at least one of the Children saw D.A. throw the television on her. Mother briefly left the home after that incident, but returned home with the Children because she felt like she had nowhere else to go. Mother testified she and D.A. "broke up on a good note not a bad note," despite his violence and anger issues. Mother stated the Children were lying when they said D.A. was around the house after they returned home in October of 2024. Mother believes John was "harassing" the Children so they had to lie.

{¶29} At the best interest portion of the trial, John testified about each of the Children. Child 1 is developmentally on target, but has a severe allergy to antibiotics. Child 1 recently started counseling. Child 1 wants to return home to Mother but is scared of D.A. Child 2 is in trauma-based counseling. Child 3 is developmentally on-target.

{¶30} Early in this case, all three children were sent to live with a maternal aunt in Akron, but that placement was disrupted because the maternal aunt would not send the children to school. Currently, the Children are in the same foster home. They are bonded to each other and to the foster family. John believes there is a bond between Mother and the Children. However, she also believes the Children will benefit from permanency, stability, and adoption. Further, despite any damage that will occur from severing the

parental relationship with Mother (particularly as to Child 1 and Child 2), the benefit of permanent custody outweighs the damage to the Children. John believes it is in the best interest of the Children for permanent custody to be granted to SCJFS.

{¶31} Counsel for the Children questioned John. She confirmed that though Child 1 stated he wanted to go back with Mother, this was primarily because he did not want to move around, and he thought, if he didn't go back with Mother, he would continually have to move around to new foster homes. Child 2 informed both John and her attorney that she wants to live with people she knows from church.

{¶32} The GAL submitted a final report, in which he opined it was in the best interest of the Children for permanent custody to be granted to SCJFS. In his report, the GAL stated as follows, "I have spoken with each individual child at school, and each child has reported that there has been contact with [D.A.] during the period of time that they were returned to Mother's home." Further, "during these interviews, it appeared evident to me that the children had been coached to not tell anyone that [D.A.] had been in the home."

{¶33} On April 30, 2025, the trial court issued a judgment entry containing findings of fact and conclusions of law. The trial court found the following: the Children have been in the temporary custody of SCJFS for a period greater than 12 of the last 22 months; the Children cannot be placed with either parent or should not be placed with either parent; and it is in the best interest of the Children that permanent custody be granted to SCJFS.

{¶34} Mother appeals the April 30, 2025, judgment of the Stark County Court of Common Pleas, Juvenile Division, and assigns the following as error:

{¶35} "I. THE TRIAL COURT ERRED IN ADMITTING INADMISSIBLE HEARSAY AND RELYING ON THE SAME IN GRANTING PERMANENT CUSTODY TO THE AGENCY."

{¶36} "II. TO THE EXTENT THAT MOTHER'S TRIAL COUNSEL FAILED TO MAKE ADEQUATE HEARSAY OBJECTIONS TO THE STATEMENTS OF THE MINOR CHILDREN AND ANONYMOUS REPORTER, MOTHER'S TRIAL COUNSEL WAS INEFFECTIVE."

{¶37} "III. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FINDING THAT PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE CHILDREN."

*Permanent Custody*

{¶38} "[T]he right to raise [a child] is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645 (1972). An award of permanent custody must be based on clear and convincing evidence. R.C. 2151.414(B)(1).

{¶39} Clear and convincing evidence is that evidence "which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.* If some competent and credible evidence going to all the essential elements of the case supports the trial court's judgment, an appellate court

must affirm the judgment and not substitute its judgment for that of the trial court. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978).

{¶40}  Issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier of fact. *Seasons Coal Co., Inc., v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419 (1997).

{¶41}  R.C. 2151.414 sets forth guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice of the filing of a motion for permanent custody of a child by a public children services agency.

{¶42}  Following the hearing, R.C. 2151.414(B)(1) authorizes the court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply:  (a) the child is not abandoned or orphaned, has not been in the temporary custody of the children services agencies for twelve or more months of a consecutive twenty-two month period, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period;

or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶43} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, a trial court will usually determine whether one of the circumstances delineated in R.C. 2151.414(B)(1)(a) through (e) is present before proceeding to a determination regarding the best interest of the child. In this case, the trial court made findings pursuant to R.C. 2151.414(B)(1)(a) (reasonable time) and R.C. 2151.414(B)(1)(d) (temporary custody of the agency for twelve or more months of a consecutive twenty-two-month period).

I.

{¶44} In her first assignment of error, Mother contends the trial court committed error in admitting two categories of hearsay statements: (1) the testimony of John that the Children told her D.A. was at Mother's home after the Children were returned home in October of 2024; and (2) the testimony of John that an anonymous source/mandatory reporter called SCJFS to report that D.A. had contact with the Children after they returned to Mother's home.

*R.C. 2151.414(B)(1)(d)*

{¶45} The trial court determined, pursuant to R.C. 2151.414(B)(1)(d), that the Children have been in the temporary custody of the agency for a period of time in excess of twelve of the prior twenty-two consecutive months. John testified the Children were in the temporary custody of SCJFS in a period of time in excess of twelve of the past twenty-

two months (from May 24, 2023, to October 31, 2024, and from December 9, 2024, until April 17, 2025). Mother does not challenge this finding by the trial court.

{¶46} As findings under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d) are alternative findings, each is independently sufficient to use as a basis to grant the motion for permanent custody. *In re Dalton*, 2007-Ohio-5805, ¶ 88 (5th Dist.). This finding alone in conjunction with a best interest finding is sufficient to support the grant of permanent custody. *In re Calhoun*, 2008-Ohio-5458, ¶ 45 (5th Dist.). Because Mother has not challenged the twelve-of-twenty-two-month finding, we need not address the merits of her claim regarding the trial court's determination under 2151.414(B)(1)(a) (reasonable time). However, as detailed below, even considering Mother's argument, we find the trial court did not commit error in its determination under R.C. 2151.414(B)(1)(a).

*R.C. 2151.414(B)(1)(a)*

{¶47} Mother argues the trial court's determination that the Children could not or should not be placed with her in a reasonable time was in error because the trial court inappropriately relied upon hearsay statements to make this determination.

{¶48} Pursuant to R.C. 2151.414(E), the trial court must consider all relevant evidence before determining the Children cannot be placed with either parent within a reasonable time or should not be placed with either parent. The statute also specifically provides that if the trial court determines, by clear and convincing evidence, at a hearing that one or more of the factors listed in (1) - (15) exist, the court shall enter a finding that the Children cannot be placed with either parent within a reasonable time or should not be placed with either parent. The existence of one factor alone will support a finding that the

Children cannot be placed with the parent within a reasonable time. *In re William S.*, 75 Ohio St.3d 95 (1996).

{¶49} As a general rule, all relevant evidence is admissible. Evid.R. 402 and 802. Hearsay is inadmissible in hearings on motions for permanent custody unless an exception to the hearsay rule applies. *In re W.R.*, 2012-Ohio-382, ¶ 22 (12th Dist.). However, "it is well-established that as the fact-finder, a trial court is presumed to have considered only properly admissible evidence unless the record affirmatively demonstrates otherwise." *In re A.F.*, 2012-Ohio-2958, ¶ 33 (12th Dist.). The admission or exclusion of relevant evidence rests in the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 173 (1987). This Court's task is to look at the totality of the circumstances and determine whether the trial court acted unreasonably, arbitrarily, or unconscionably in allowing or excluding the disputed evidence. *In re Z.G.A.A.*, 2024-Ohio-326, ¶ 71 (5th Dist.).

{¶50} An admission by a party-opponent is not considered hearsay. Evid.R. 801. An admission by a party-opponent is a statement that "is offered against a party and is (a) his own statement, in either his individual or representative capacity …". Evid.R. 801(D)(2). The Supreme Court of Ohio has held, "a child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding, and, therefore, is entitled to independent counsel in certain circumstances." *In re Williams*, 2004-Ohio-1500 at ¶ 29.

{¶51} In this case, the Children are juveniles subject to a court proceeding to terminate parental rights, and are thus parties to the case. The trial court appointed independent counsel to represent the Children because both Child 1 and Child 2 stated they wanted to return to Mother's home. The Children's trial counsel examined the

witnesses on behalf of the Children. The Children's trial counsel examined John on behalf of the children. Counsel asked John to confirm that Child 2 told her that D.A. was in Mother's home in December of 2024, and asked John to confirm that Child 1 told her that D.A. was in Mother's home after the Children returned home in 2024 and showed Child 1 how to play a video game. John responded by confirming what the Children told her. John's testimony was not hearsay because the statements were admissions by party-opponents.

{¶52} Additionally, Mother is unable to demonstrate how the admission of this alleged hearsay evidence subjected to her to any resulting prejudice. John's testimony about what the Children said, and her testimony about what an anonymous source reported, was cumulative to other evidence contained within the record. The GAL's report contained information about what the Children reported along with his impression that the Children were coached not to report this information to him. "[G]iven the guardian's role and the requirements that [he] explain [his] investigation and the basis for [his] recommendation, [his] report and testimony may necessarily include information about what other people told [him]." *DiDonato v. DiDonato*, 2016-Ohio-1511, ¶ 79 (5th Dist.), quoting *Sypherd v. Sypherd*, 2012-Ohio-2615 (9th Dist.). Further, John specifically testified that circumstances other than the Children's verbal reports to her caused her concern during the home visits, i.e., Mother's strong objections to Mother's unannounced home visits and the Children's general attitude of being worried when John visited.

{¶53} Mother herself testified she knew who the anonymous/mandatory source was, testified that she knew what they reported to SCJFS (seeing D.A.'s car in Mother's driveway), and testified as to why this information should not have been used to remove

the Children from the home (because it was allegedly D.A.'s grandmother at the house, not him). Because the alleged hearsay testimony about the mandatory reporter's "tip" to SCJFS is cumulative, there is no prejudice as a result of its admission.

{¶54} Because this testimony is cumulative to other evidence in the record, there is no prejudice as a result of its admission. *In re M.G.*, 2023-Ohio-1316, ¶ 36 (12th Dist.); *In re A.G.*, 2024-Ohio-1846, ¶ 46 (3rd Dist.).

{¶55} Further, "an error in the admission of evidence is not ground for reversal unless substantial rights of the complaining party were affected or it appears that substantial justice was not done." *In re Z.G.A.A.*, 2024-Ohio-326, ¶ 69 (5th Dist.), quoting *Petti v. Perna*, 86 Ohio App.3d 508, 514 (3rd Dist.) In "determining whether a substantial right of a party has been affected, the reviewing court must decide whether the trier of fact would have reached the same decision had the error not occurred." *Id.*

{¶56} Assuming arguendo that that the trial court committed error in admitting hearsay testimony, we find the trial court would have reached the same conclusion on permanent custody, as this determination was not based solely on the hearsay testimony. The trial court specifically cited factors other than the hearsay testimony in its determination that the Children could not be returned to Mother or should not be returned to Mother, including: Thomas' testimony about Mother's failure to understand the gravity of the abusive relationship with D.A.; Fire's testimony that Mother minimized domestic violence concerns by continually defending D.A. and stating her relationship with D.A. was "great"; both John's and Fire's testimony that, despite her completion of the Goodwill Parenting program, there were lingering concerns about Mother's ability to keep the Children safe; Fire's testimony that, even at the conclusion of the Goodwill Parenting

program, Mother prioritized her relationship with D.A. despite Mother claiming they were no longer together; John's testimony that Mother reverted to the position that the Children were lying about the abuse; John's testimony that Mother did not successfully complete her case plan; Fire's testimony that Mother cancelled six out of eight appointments with the Goodwill Home program and was terminated from the case management program for excessive cancellations; Mother's own testimony denying that D.A. ever hit the Children and calling the Children liars.

{¶57} Thus, Mother has not established that admission of the alleged hearsay testimony undermines confidence in the outcome of the proceeding. There is no indication the trial court would have made a different determination without the alleged hearsay testimony, particularly since the trial court listed multiple other factors it took into consideration in making its decision. A review of the trial court's judgment entry demonstrates that its determination was not based solely on either: (1) the report from the anonymous source that the Children saw D.A. or (2) the Children's reports to John that D.A. was at the home.

{¶58} Mother's first assignment of error is overruled.

II.

{¶59} In her second assignment of error, Mother raises a claim of ineffective assistance of counsel for the failure of her trial counsel to object to the hearsay testimony of the Children and the anonymous source.

{¶60} "A parent is entitled to the effective assistance of counsel in cases involving the involuntary termination of his or her parental rights." *In re J.J.*, 2024-Ohio-4558, ¶ 30 (5th Dist.), quoting *In re B.J. & L.J.*, 2016-Ohio-7440, ¶ 68 (12th Dist.). In a permanent

custody proceeding, this Court applies the same test for ineffective assistance of counsel as we apply in criminal cases. *Id.* at 31. First, we must determine whether counsel's assistance was ineffective, i.e., whether counsel's performance fell below an objective standard of reasonable representation and violated any of his or her essential duties to the client. *Strickland v. Washington*, 466 U.S. 668 (1984). If we find ineffective assistance of counsel, we must then determine whether or not the defense was actually prejudiced by counsel's ineffectiveness such that the reliability of the outcome of the proceeding is suspect. *Id.* This requires a showing that there is a reasonable probability that, but for counsel's unprofessional error, the outcome of the trial would have been different. *Id.*

{¶61} First, trial counsel for Mother did object to the hearsay testimony. Thus, trial counsel was not deficient for failing to object. Second, as discussed above, because Mother has not demonstrated John's testimony was hearsay, she has not shown that her counsel's performance was deficient. Further, even if the testimony was hearsay, Mother has not demonstrated the trial court's permanent-custody determination was based solely on those circumstances, and therefore has not established there is a reasonable probability that, but for counsel's alleged error, the outcome of the proceeding would have been different even if the trial court had not heard the alleged hearsay testimony.

{¶62} Mother's second assignment of error is overruled.

III.

{¶63} In her final assignment of error, Mother contends the trial court's finding that it is in the best interest of the Children for permanent custody to be granted to SCJFS to be in error.

{¶64} We have frequently noted, "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re Mauzy Children*, 2000 WL 1700073, * 3 (5th Dist. Nov. 13, 2000), citing *In re Awkal*, 95 Ohio App.3d 309, 316 (8th Dist. 1994).

{¶65} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents, and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody; and (5) whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶66} The trial court must consider all the elements in R.C. 2151.414(D), as well as other relevant factors. There is not one element that is given greater weight than the others pursuant to the statute. *In re Schaefer*, 2006-Ohio-5513, ¶ 56. *In re Schaefer* made it clear that a trial court's statutory duty, when determining whether it is in the best interest of a child to grant permanent custody to an agency, does not include finding by clear and convincing evidence that no suitable relative was available for placement. *Id.* R.C. 2151.414 "requires the court to find the best option for the child once a determination

has been made pursuant to R.C. 2151.414(B)(1)(a) through (d). The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than others." *Id.* at ¶ 64.

{¶67} The focus on the "best interest" determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents. *In re Awkal*, 95 Ohio App.3d 309, 316 (8th Dist. 1994).

{¶68} Mother first argues the trial court improperly considered the hearsay testimony of the Children and the anonymous reporter in its best interest determination. However, the trial court did not cite either the Children's, or the anonymous reporter's, statements in either its "Findings of Fact" or "Conclusions of Law" section for best interest. There is no evidence the trial court considered the hearsay testimony in its best interest determination. Thus, Mother has failed to demonstrate how the admission of such evidence subjected her to any resulting prejudice. *In re K.B.*, 2014-Ohio-3654, ¶ 83 (12th Dist.) (admission of hearsay in permanent custody case, even if error, is not prejudicial unless it is shown that the judge relied on improper evidence in making his or her decision).

{¶69} Further, as detailed above, the Children are parties to this case. The Children's statements are admissible to show that, although their wishes were to return to Mother, granting SCJFS permanent custody was in their best interest. Finally, Mother fails to show prejudice by the admission of any of the alleged hearsay evidence in the trial court's determination of best interest. There is no indication the trial court would have

made a different determination without this testimony, particularly since there are multiple other factors taken into consideration in the best interest determination.

{¶70} Mother also contends the trial court committed error in finding granting permanent custody to SCJFS was in the best interest of the Children because of the wishes of the Children and the bond the Children have with Mother.

{¶71} Based on Child 1's and Child 2's statements that they wanted to go home with Mother, the trial court appointed the Children independent counsel. Counsel for the Children did not present any new evidence that returning the Children to Mother was in their best interest, nor did counsel present any additional statements by the Children expressing their wishes to be reunited with Mother. Rather, during the best interest portion of the hearing, counsel for the Children indicated that Child 2 no longer wanted to go live with Mother but rather wanted to go live with her best friend from church. Further, that Child 1 only wanted to go back with Mother because he thought that, if he stayed in foster care, he would have to continually move homes.

{¶72} We find the trial court did not commit error in finding that granting permanent custody to SCJFS is in the best interest of the Children. John testified it is in the best interest of the Children for permanent custody to be granted to SCJFS. While Child 1 initially wanted to return to Mother, he only wanted to do so because he did not want to continually move homes. John also testified that Child 2 no longer wants to return to Mother; she wants to go live with friends from church. John testified the Children are doing well, and are all together at a stable placement. They are bonded to each other, and bonded to the foster family. The GAL also opined in his report that it is in the best interest of the Children for permanent custody to be granted to SCJFS. While John testified there

is a bond between the Children and Mother, she also testified that any damage that would occur from severing that bond would be outweighed by the benefits of permanency and stability.

{¶73} We find the trial court properly considered and weighed the factors in R.C. 2151.414(D) and the trial court's conclusion that the granting of permanent custody to SCJFS is in the best interest of the Children is supported by competent and credible evidence.

{¶74} Based on the foregoing, Mother's assignments of error are overruled. The April 25, 2025, judgment of the Stark County Court of Common Pleas, Juvenile Division, is affirmed. Costs to Mother.

By: Popham , J.

Hoffman, P.J. and

King,  J.